**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| SAMARA HEITHCOCK, individually | ) | |
| and as next friend of her minor | ) | |
| daughter, M.H., | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:14-CV-2377 |
| | ) | Judge Aleta A. Trauger |
| | ) | |
| TENNESSEE DEPARTMENT OF | ) | |
| CHILDREN'S SERVICES, *et al.*, | ) | |
| | ) | |
|     Defendants. | ) | |

<u>**MEMORANDUM**</u>

Pending in this case are two motions to dismiss.  The Tennessee Attorney General has filed (1) a Motion to Dismiss the claims against defendants Department of Children's Services ("DCS"), James M. Henry ("Henry"), Sharonika Nelson Jones ("Jones"), and Jamila Sugri ("Sugri") in their official capacities ("Motion to Dismiss Official Capacity Claims") (Docket No. 11), and (2) a Motion to Dismiss the claims against defendants Henry, Jones, and Sugri in their individual capacities ("Motion to Dismiss Individual Capacity Claims") (Docket No. 23).  Plaintiff Samara Heithcock ("Heithcock") has filed a joint Response.  (Docket No. 28.)  For the following reasons, both motions will be granted.

<u>**FACTS AND PROCEDURAL BACKGROUND**</u>

This case, brought under 42 U.S.C. § 1983 and the laws of the state of Tennessee, concerns the state's involvement in events that resulted in the plaintiff's temporary loss of the

custody of her daughter.[1]  Heithcock and her three-year-old daughter M.H. are residents of

Williamson County, Tennessee.  DCS is an agency of the State of Tennessee.  At all times

relevant to this action, Henry, Jones, and Sugri were employees of DCS, acting within the scope

of their employment.  Henry was Commissioner of DCS.  Jones was a supervisor at DCS's Office

of Child Safety (also known as Child Protective Services) ("CPS").  Sugri was a social worker at

CPS.

      In May 2013, Heithcock began to notice unusual and concerning behavior exhibited by

M.H. after M.H.'s visitation with her father ("Father"), including "recurring vaginal

irritation, poking her vagina, habitually grabbing her vagina, and poking a hairbrush handle to

her vagina."  (Doc. No. 6, ¶ 16).  Six months later, on November 13, 2013, during M.H.'s routine

wellness check-up with her pediatrician, Heithcock requested that M.H. be examined for a

urinary tract infection, thinking that it might be causing her unusual behavior.  The nurse

questioned Heithcock about the possibility of sexual abuse and recommended that she make an

appointment with Our Kids, a non-profit corporation that provides testing and treatment for

sexually abused children.  (*Id*. at ¶ 17.)  The Complaint alleges that, at this point, Heithcock

"became concerned about the possibility of sexual abuse because 1) Father was an admitted sex

addict; 2) Father refused to provide information [to her] about his male roommate who was

unknown to her; and 3) Heithcock was a victim of sexual abuse in her own childhood."  (*Id*. at ¶

18.)

      On November 15, 2013, Heithcock made an appointment with Our Kids as

---

[1] Facts are taken from the Amended Complaint (Docket No. 6) and assumed to be true for
purposes of evaluating the motions to dismiss.

recommended; Our Kids informed Heithcock that she was required by law to report her concerns to CPS Central Intake. (*Id*. at ¶ 19.) Heithcock called CPS Central Intake the same day "out of an abundance of caution . . . even though she was not sure any sexual abuse had occurred." (*Id*. at ¶ 20.) M.H. was examined by Our Kids on November 18, 2013. (*Id*. at ¶ 21.) The Our Kids nurse found a red spot on M.H.'s vagina but could not ascertain the cause of the red spot. (*Id*.) On November 21, 2013, in her capacity as a CPS social worker, Sugri called Heithcock and informed her that an appointment had been made for M.H. at Davis House Child Advocacy Center ("Davis House"). (*Id*. at ¶ 22.) Believing that she was required to comply, Heithcock allowed M.H. to be subjected to a videotaped forensic interview and several sessions of forensic evaluation. (*Id*.) According to the Complaint, Heithcock was informed that M.H. made some "concerning disclosures," but she was never told the substance of the disclosures. (*Id*.)

On December 2, 2013, the Juvenile Court of Williamson County held a review hearing, at which the Father was supposed to provide certain information that he had been withholding from Heithcock; however, the Father failed to attend. (*Id*. at ¶¶ 23-24.) Another hearing occurred on December 16, 2013. At that time, Sugri interviewed Heithcock's other child "without consent or legal representation." (*Id*. ¶ 25.) At the hearing, Sugri recommended an "unsubstantiated" classification for Heithcock's sexual abuse complaint; Heithcock alleges that this recommendation was made without CPS approval or adequate investigation. (*Id*. ¶ 26.) Heithcock further alleges that Davis House informed her that Davis House had not itself made a classification. (*Id*. at ¶ 27.) Heithcock also alleges that Sugri falsely represented to the court that she interviewed Heithcock and her mother after the December 16 hearing. (*Id*. ¶ 28.) Heithcock avers that she reported Sugri to Jones, Sugri's supervisor, on the advice of Davis House, to no

avail. (Doc No. 6, ¶ 30).  The Complaint claims that Jones "worked with Sugri" to cause harm to Heithcock.  (*Id.*)

Both Heithcock and the Father thereafter sought orders of protection against each other (the Father in Davidson County and Heithcock in Williamson County). (*Id.* ¶¶ 29, 31).  On January 6, 2014, a hearing was held on Heithcock's petition.  Heithcock accused the Father of hacking into her email account and deleting important custody files that implicated him as a sex addict.  (*Id.* ¶ 32.)  The Father denied the accusations and the court dismissed Heithcock's petition due to lack of evidence.  (*Id.*)  Stemming from Heithcock's accusations during this hearing, the Father alleged to the court that Heithcock was mentally unstable.  (*Id.* ¶ 33.)  The Complaint alleges that DCS "accepted" this allegation without any foundation.  (*Id.*)

Soon after, on January 9, 2014, despite being "reprimanded by Davis House,"[2] Sugri visited Heithcock's home to "explain" the "unsubstantiated" classification that Sugri had given to the court regarding the child abuse investigation.  (*Id.* ¶ 34.)  According to the Complaint, the day and time of Sugri's visit was inconvenient for Heithcock because both M.H. and workmen repairing fire damage were present in the home, so Heithcock requested that the meeting be rescheduled.  (*Id.* ¶ 35.)  However, Sugri entered "without invitation" through an open door.  (*Id.*)  At that point, Heithcock did not demand Sugri leave but, rather, spoke with Sugri for approximately 20-25 minutes, including pleading for her to take the child abuse investigation more seriously.[3]  (*Id.* ¶¶ 36-37).

---

[2] The Complaint does not specify the subject of the reprimand.  The Complaint also does not explain how Davis House would have the authority to "reprimand" Sugri, a DCS employee.

[3] The Complaint states that Sugri was "not at [Heithcock's] home in an investigative capacity."  (Docket No. 6 at ¶ 37.)  This is a legal conclusion, not an averment of fact, and as such is not entitled to deference at the motion to dismiss stage.

On January 21, 2014, the Father filed a petition against Heithcock in the Williamson County Juvenile Court, alleging mental instability and that M.H. was neglected by Heithcock. (*Id*. ¶ 38.) The Complaint alleges that the Father had "advance knowledge" that Sugri intended to ask the court to declare Heithcock mentally unstable and recommend that M.H. go into the Father's temporary custody. (*Id*.) At a January 27, 2014 hearing, Heithcock alleges that Sugri, when called as a witness, misrepresented to the court during testimony that Heithcock was mentally unstable, vindictive, and hostile. (*Id*. ¶ 40.) Sugri also allegedly falsely testified that Heithcock had knowingly disparaged the Father in the presence of her daughter. (*Id*. ¶ 40).

The Juvenile Court ordered M.H. removed into state custody; the Complaint alleges that the removal was a result of Sugri's "inadequate investigation and fraudulent misrepresentations" to the court. (*Id*. ¶ 42.) Heithcock alleges that Sugri informed her that, if she continued to try to prove that the Father hacked her email, she would have a difficult time regaining custody of her daughter. (*Id*. ¶ 43.) DCS subsequently placed M.H. in the custody of the Father's fiancée for a period of two weeks. (*Id*. ¶ 44.) On February 10, 2014, the Father confessed, during a recorded telephone conversation, to hacking Heithcock's email in order to destroy her files containing correspondence regarding his sex addiction. (*Id*. ¶ 45.) The Father was subsequently found guilty of a misdemeanor and Heithcock was granted an order of protection "limiting contact to parental association." (*Id*.)

On February 8, 2014, Heithcock began to receive bullying text messages from the Father's fiancee, pressuring Heithcock to agree to a parenting arrangement for M.H. outside of the court proceedings, in exchange for the Father's dropping his petition for a finding of dependency and neglect. (*Id*. ¶ 46.) Due to the severity of the messages (and after presumably being notified by Heithcock), DCS called an emergency meeting. (*Id*. ¶ 47.) On February 12,

2014, during that meeting, the Father's fiancée admitted that she suspected the Father of having a sex addiction and confirmed that he had sought counseling for a sex addiction prior to the CPS investigation. (*Id*. ¶ 48.) The Father's fiancée claimed she could no longer adequately protect M.H. from the Father and returned M.H. to CPS. (*Id*. ¶ 48). M.H. was placed in foster care on an emergency basis. (*Id*.).

The Complaint alleges that, at a hearing on February 24, 2014, Sugri asserted that, without any evidence that Heithcock had harmed M.H., Heithcock's parental rights should be terminated. (*Id*. at ¶ 49.) The Complaint further alleges that Sugri took this action in retaliation for Heithcock's complaints about Sugri during the course of Sugri's investigation. (*Id*.). By this time, the Court Appointed Special Advocate ("CASA"), who had initially sided with DCS, began to realize that M.H. was suffering harm as a result of being taken from her mother. (*Id*. ¶ 51.) The CASA worked to convince DCS that M.H. should be reunited with Heithcock. (*Id*.)

On March 24, 2014, Heithcock was granted a ninety-day trial home visit with M.H. (*Id*. ¶ 52). On June 24, 2014, Heithcock regained full legal and physical custody of M.H. (*Id*. ¶ 53). On July 21, 2014, the Father's charge of dependency and neglect was dropped. (*Id*. ¶ 54). The Complaint alleges that, in August 2014, Heithcock made a request to review her file to evaluate her options about making a formal complaint against Sugri and was advised by a DCS employee: "'be careful of what you do so as to not run the risk of ending up back in court in a similar [custody] situation' or words to that effect." (*Id*. ¶ 55).

Heithcock filed the Complaint on December 22, 2014 (Docket No. 1) and the Amended Complaint ("Complaint") on January 13, 2015 (Docket No. 6.). On January 27, 2015, defendants DCS, Henry, Jones and Sugri filed the Motion to Dismiss Official Capacity Claims. (Docket No. 11.) Following service on Henry, Jones, and Sugri, on April 2, 2015, those defendants filed the

Motion to Dismiss Individual Capacity Claims.  (Docket No. 23.)  On June 12, 2015, Heithcock

filed a joint Response.[4]  (Docket No. 30.)

The Complaint alleges both federal and state causes of action.  Count One is a claim

against all defendants under 42 U.S.C. § 1983, for violation of the right to familial association

under the Fourteenth Amendment to the U.S. Constitution.[5]  Count Two is a claim against all

defendants under 42 U.S.C. § 1983, for violation of the right to be free from unreasonable seizure

under the Fourth Amendment to the U.S. Constitution.  Count Three is for supervisor liability

against defendants Henry and Jones.  Count Four is a claim against all defendants for violation of

state civil rights laws.  Count Five is a state law claim against all defendants for fraud and

misrepresentation.  Count Six is a state law claim against all defendants for intentional infliction

of emotional distress.  Count Seven is a state law claim against all defendants for false

imprisonment.

## LEGAL STANDARDS

### I.    Rule 12(b)(1) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(1) governs dismissal of lawsuits for lack of subject

matter jurisdiction.  "Rule 12(b)(1) motions to dismiss . . . generally come in two varieties: a

facial attack or a factual attack."  *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d

320, 330 (6th Cir. 2007).  A state's assertion of sovereign immunity constitutes a factual attack.

---

[4] On June 17, 2015, the court entered a Protective Order placing the pleadings in this matter under seal.  (Docket No. 32.)

[5] The Complaint and the Response brief conflate Heithcock's potential claims based separately on substantive and procedural due process, each of which has been recognized in the context of the right to familial association.  *See M.L.B. v. S.L.J.*, 519 U.S. 101, 116 (1996).  However, the specific nature of Heithcock's Section 1983 claim does not determine the court's rulings *infra*.

*See Dunn v. Spivey*, No. 2:09–0007, 2009 WL 1322600, at *3 (M.D. Tenn. May 11, 2009).

When "considering a factual attack upon the court's jurisdiction, no presumption of truth applies

to the plaintiff's factual allegations, and the court is free to weigh the evidence and resolve

factual disputes so as to satisfy itself as to the existence of its power to hear the case." *Id.*

(internal citation and quotation marks omitted). "In its review, the district court has wide

discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve

jurisdictional facts." *Gentek*, 491 F.3d at 330. "The entity asserting [sovereign] immunity has

the burden to show that it is entitled to immunity, *i.e.*, that it is an arm of the state." *Gragg v. Ky.*

*Cabinet for Workplace Dev.*, 289 F.3d 958, 963 (6th Cir. 2002).

## II.   <u>Rule 12(b)(6) Motion to Dismiss</u>

When deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the

court will "construe the complaint in the light most favorable to the plaintiff, accept its

allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v.*

*Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir.

2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "'a short and

plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim

is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957); *see also*

*Erickson v. Pardus*, 551 U.S. 89, 127 (2007) (reaffirming the liberal pleading standard of Federal

Rule of Civil Procedure 8(a)(2). The court must determine only whether "the claimant is entitled

to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts

alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416

U.S. 232, 236 (1974)).

Detailed factual allegations are not required, but a complaint's allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on labels, "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Twombly*, 550 U.S. at 555. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (quoting *Twombly*, 550 U.S. at 556).

## ANALYSIS

### I.   Official Capacity Claims and Sovereign Immunity

Defendants DCS, Henry, Jones, and Sugri argue that they are immune from Heithcock's official capacity Section 1983 claims based on Eleventh Amendment sovereign immunity. This is a challenge as to the court's subject matter jurisdiction over Heithcock's Section 1983 official capacity claims under Rule 12(b)(1).[6] *See Hornberger v. Tennessee*, 782 F.Supp.2d 561, 563 (M.D. Tenn. 2011).

Each of the states possesses certain immunities from suit that "flow from the nature of sovereignty itself as well as the Tenth and Eleventh Amendments." *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (*en banc*). Consequently, a state may not be sued for money damages in federal court by a private individual, subject to a few exceptions. *Id.* at 358–59; *see also*

---

[6] The defendants incorrectly style the Motion to Dismiss Official Capacity Claims as a Rule 12(b)(6) motion.

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'"); *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). The Supreme Court has made clear that state agencies (*i.e.*, "arm[s] of the state") and those agencies' officials enjoy this same immunity. *Ernst*, 427 F.3d at 358 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). This is because the individuals are working on behalf of the state, and so a complaint against such an individual in his official capacity "is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the state itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Stated differently, generally speaking, states, arms of the state, and those arms' officials are not "persons" for purposes of Section 1983 liability. *Id.* The only exceptions to the general rule of sovereign immunity are: 1) where a state has waived its immunity and has consented to be sued in federal court (*see Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984)); 2) where Congress validly abrogates sovereign immunity through its enforcement powers pursuant to the Fourteenth Amendment to the United States Constitution, (*see Seminole Tribe of Florida*, 517 U.S. at 57-73; *Quern v. Jordan*, 440 U.S. 332 (1979)); and 3) in the narrow case where a plaintiff sues state officials in their official capacities seeking only prospective injunctive relief for a continuing violation of federal law (*see Ex Parte Young*, 209 U.S. 123, 159-60 (1908); *Idaho v. Coeur D'Alene Tribe*, 521 U.S. 261, 269 (1997)).

The court finds that sovereign immunity applies here. There is no serious question as to whether DCS is a state agency protected by Tennessee's sovereign immunity. *See* Tenn Code

Ann. § 37-5-101, *et seq.*; *Reid v. Osborn*, No. 2:11-CV-283, 2012 WL 3611907, at *8 (E.D. Tenn. Aug. 21, 2012); *Lance v. Locke*, No. 3:12-cv-757, 2012 WL 4192893, at *5 (M.D. Tenn., Sept. 18, 2012); *Dismukes v. Comm'r, Tenn. Dep't of Children's Servs.*, No. 3:04-0170, 2006 WL 1102584, at *8 (M.D. Tenn. Apr. 25, 2006). Heithcock has sued Henry, Jones, and Sugri in their official capacities with DCS. Because an award in this suit on those official capacity claims would ultimately be paid by the State of Tennessee, Tennessee's sovereign immunity protects the named defendants and requires dismissal of the official capacity claims against them. *Id.*; *Lance*, 2012 WL 4192893 at *5; *see also Ritter v. Univ. of Mich.*, 851 F.2d 846, 848 (6th Cir. 1988); *Boyd v. Tenn. State Univ.*, 848 F.Supp. 111, 114 (M.D. Tenn. 1994). The only remaining issue is whether any of the three exceptions described above applies to mitigate the sovereign immunity. The plaintiff has not argued in favor of any exception, and no cognizable argument can be made for them: (1) Congress has not abrogated Eleventh Amendment immunity under Section 1983, *Quern,* 440 U.S. at 341; (2) Tennessee has not waived it or consented to suit, *Reid*, 2012 WL 3611907 at *8 (citing *Gross v. Univ. of Tenn.*, 620 F.2d 109, 110 (6th Cir. 1980)); and (3) the Complaint seeks no prospective injunctive relief of the nature that would implicate *Ex Parte Young* (*see* Docket No. 6, Prayer for Relief).

Accordingly, based on Eleventh Amendment sovereign immunity, the court will dismiss all Section 1983 claims against DCS, and the official capacity Section 1983 claims against Henry, Jones, and Sugri, for lack of subject matter jurisdiction.[7]

## II.     Individual Capacity Section 1983 Claims Against Defendant Sugri

---

[7] Because of the court's ruling regarding Heithcock's state law claims, discussed *infra*, the court need not address whether Tennessee has waived sovereign immunity as to any of the state law claims.

Heithcock asserts that Sugri, in her individual capacity, violated Heithcock's constitutionally-protected rights to familial association (Count One) and against unreasonable seizure (Count Two). Sugri contends that, under governing Sixth Circuit precedent, she is entitled to either absolute or qualified immunity for the alleged actions that form the basis for these Section 1983 claims against her in her individual capacity. Heithcock contends that Sugri, as a bad actor who knowingly initiated the process that deprived Heithcock of her rights, is not entitled to absolute immunity for any of her actions and fails the applicable test for qualified immunity.

### A. Absolute Immunity for Testimony and Recommendations Before Juvenile Court

First, Heithcock alleges that Sugri provided negligent, false, and malicious testimony and recommendations to Heithcock's detriment before the Juvenile Court.

As a general principle, the U.S. Supreme Court has expressly ruled that Section 1983 does not authorize a plaintiff to assert a claim against a government official for damages for giving false testimony as a witness at a trial. *See Briscoe v. LaHue*, 460 U.S. 325, 326 (1983) (holding that police officer who gave perjured testimony at trial was absolutely immune from money damages suit under Section 1983). Indeed, as the Sixth Circuit has further explained, a government witness is entitled to testimonial immunity against a Section 1983 action, "no matter how egregious or perjurious that testimony was alleged to have been." *Moldowan v. City of Warren*, 578 F.3d 351, 390 (citing *Spurlock v. Satterfield*, 157 F.3d 995, 1001 (6th Cir. 1999)). The underlying rationale of this absolute immunity doctrine is that the government official functions as an ordinary witness subject to the adversary process inherent in a trial and is thus a "testifying" witness, as opposed to a "complaining" witness, such as one who might operate

outside that process (*e.g.*, at an *ex parte* hearing) to unfairly bring legal process to bear against another party. *See Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003). Thus, while a testifying government witness is protected by absolute immunity, a complaining witness is not. *Id*.; *see also Kalina v. Fletcher*, 522 U.S. 118, 129-31 (1997).

The Complaint alleges that Sugri's testimony and recommendations were made to the Juvenile Court in the context of her testimony as a witness called in the dependency and neglect petition brought by the Father. At that time, Sugri was, therefore, a DCS official subject to adversarial cross-examination. Sugri satisfies the definition of a testifying witness. Accordingly, no matter how negligent, false or egregious Sugri's testimony and recommendations may have been, Sugri is entitled to absolute immunity against Heithcock's Section 1983 claims based thereon.

Even if the court were to consider Sugri to have played some heightened role in initiating the dependency and neglect petition before the Juvenile Court, however, or to characterize her as a complaining witness, Sugri would still be entitled to absolute immunity. The Sixth Circuit has held that social workers are absolutely immune when, akin to prosecutors, they act in their capacity as "legal advocates" in initiating and pursuing child dependency hearings and testifying under oath. *See Holloway v. Brush*, 220 F.3d 767, 774-75 (6th Cir. 2000); *Cady v. Arenac Cnty.*, 574 F.3d 334 (6th Cir. 2009). In so finding, the Sixth Circuit has distinguished prosecutors' and social workers' legal advocacy functions from, for example, non-advocacy legal functions, such as administrative, investigative, or other tasks, which are not entitled to absolute immunity (but rather only qualified immunity). *Pittman v. Cuyahoga Cnty. Dep't of Children and Family Servs.*, 640 F.3d 716, 724 (6th Cir. 2011)*; see also Kovacic v. Cuyahoga Cnty. Dep't of Children*

& *Family Servs.*, 724 F.3d 687, 694 (6th Cir. 2013), *cert. denied sub nom. Campbell-Ponstingle v. Kovacic*, 134 S. Ct. 2696 (2014). The court has been clear: "absolute immunity based on a prosecutorial function covers interactions with a court, such as testimony or recommendations given in court concerning the child's best interests as [the defendant] saw the matter." *Kovacic*, 724 F.3d at 694 (internal quotation marks omitted). It also includes preparing an order for entry by the court, *id.*, and acting in an advisory role (such as preparing and giving reports) to the juvenile court in recommending whether a child is ready to return home from state custody, *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 422–23 (6th Cir. 2001). When immunity applies, "the defense of absolute immunity provides a shield from liability for acts performed erroneously, even if alleged to have been done maliciously or corruptly." *Kovacic*, 724 F.3d at 694 (quoting *Dean v. Byerley*, 354 F.3d 540, 554 (6th Cir. 2004)). Thus, under the Sixth Circuit's "functional" analysis, whether a social worker is entitled to absolute immunity depends on whether her complaining actions were taken in her capacity as a "legal advocate." *See Pittman*, 640 F.3d at 724; *Holloway*, 220 F.3d at 775.

In *Pittman*, the district court concluded that a social worker was not entitled to absolute immunity for "regularly, repeatedly and on an ongoing basis misrepresenting [a parent's] status, his whereabouts and his attitude toward parenting . . . in . . . filings to the [j]uvenile [c]ourt." *Pittman*, 640 F.3d at 723–24. The Sixth Circuit disagreed. *Id.* at 724. The fact that the social worker made intentional misrepresentations to the juvenile court did not affect the appellate court's finding that she was in fact entitled to the shield of absolute immunity. *Id.* at 725. The Sixth Circuit rejected the district court's determination that "making misrepresentations . . . to the juvenile court . . . is conduct that would not constitute advocacy" as being at odds with the

courts' functional approach to prosecutorial immunity. *Id.* In *Cady*, the court explained this

approach further by articulating that, "so long as the general nature of the action in question is

part of the normal duties of a prosecutor," absolute immunity bars a [Section] 1983 action even

when the conduct was "unquestionably illegal or improper." *Cady*, 574 F.3d at 340. The

*Pittman* court further stated that

> [b]ecause absolute immunity for social workers is akin to absolute
> immunity for prosecutors, the same protection must apply here, no
> matter how undesirable the results. In the words of Chief Judge
> Learned Hand, absolute immunity represents a balance between
> evils; [i]t has been thought in the end better to leave unredressed
> the wrongs done by dishonest officers than to subject those who try
> to do their duty to the constant dread of retaliation.

*Pittman*, 640 F.3d at 726 (internal quotation marks omitted).

In this court's view, Sugri's complained-of acts – specifically her testimony under oath

before the Juvenile Court and reports and recommendations to the court regarding Heithcock and

M.H., no matter how allegedly false, improper, or even malicious – fall under the umbrella of

legal advocacy as defined by the Sixth Circuit. As the *Pittman* court explained, absolute

immunity covers matters such as "testimony or recommendations . . . concerning the child's best

interests as [the social worker]] saw the matter." *Pittman*, 640 F.3d at 725 (internal quotation

marks omitted).[8] The Complaint alleges Sugri gave the same type of testimony and

recommendations described in *Pittman*, except that Sugri's "agenda" sharply diverged from

---

[8] The Complaint also references a failure to provide "exculpatory evidence," but it provides no further information or description. Regardless, a *Brady* due process claim is typically only recognized in the criminal context. *See Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993). Moreover, the duty to provide exculpatory evidence rests with the prosecuting party. *Id.* at 353. As discussed, *supra*, the petitioning party here was the Father, not Sugri, and so this does not properly form the basis of a claim against the defendants.

Heithcock's.[9]

Heithcock's argument to the contrary is not persuasive. First, Heithcock relies upon *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 590 (6th 2008), for the idea that there can be circumstances in which deliberate or reckless behavior, such as filing a false report with the court, can cross an (undefined) line to foreclose immunity. The issue in *Jenkins* – an appeal of a summary judgment decision in a First Amendment Section 1983 action – was whether a claim of invasion of privacy, based on the submission of a false child abuse investigation report, could constitute a violation of the right to child rearing. The *Jenkins* court, while acknowledging three out-of-circuit cases in which a false report had been found to be a constitutional violation, declined to follow suit. *Jenkins*, however, does not control here. This is not a First Amendment action, and *Jenkins* does not erode the legitimacy of the defendants' immunity defenses. Setting *Jenkins* aside, Heithcock fails to rebut the assertion that Sixth Circuit precedent concerning social worker immunity applies here.

Second, Heithcock attempts to capitalize on the fact that Sugri entered her home via an open door at an inconvenient time, rather than reschedule an interview at Heithcock's request –

_____

[9] In her Response, Heithcock notes that, in February 2014, the Juvenile Court, as part of the court's order removing M.H. from the custody of her parents, ordered DCS to file a petition for dependency and neglect to supplement the petition filed by the Father. (Docket No. 28 at p. 6.) Heithcock offers proof of the filing in the form of Sugri's case notes, which state "[t]he courts thus removed the child from the custody of both parents and placed her in the custody of the state and ordered DCS to file a petition for dependency and neglect . . . [t]he court ordered . . . petition was filed on 2/14/2014." (*See id.* at Ex. C.) Sugri's filing of this petition did not remove her from the ambit of immunity because, at that point, Sugri had completed her testimony and recommendations, the court had conducted its hearing and decided the custody matter against the parents, and Sugri was acting pursuant to the court's order. *See* Section II.B., *infra*. Sugri's subsequent testimony and recommendations regarding M.H. pursuant to the DCS-filed petition were still of the nature subject to the immunity discussed herein.

arguing in the Response that this was a "warrantless entry" that led to the seizure of M.H. (that, presumably, should foreclose immunity). However, the Complaint does not allege that Heithcock resisted Sugri's entry in any way other than being displeased by it (*e.g.*, called the police, refused to speak with Sugri, etc.) To the contrary, the Complaint alleges that, after Sugri entered, Heithcock voluntarily spoke with her, in the house, for twenty to twenty-five minutes. Heithcock offers no precedent to support the assertion that this is unconstitutional behavior. And Heithcock's last argument, that Sugri "knowingly set in motion a series of events that she knew would lead to a violation" of Heithcock's rights (Docket No. 28 at pp. 10-11), is vague and supported only by caselaw not binding on this court.

Accordingly, the court finds that Sugri is also entitled to absolute immunity against Heithcock's Section 1983 claims for her court testimony and recommendations, pursuant to Sixth Circuit precedent based on Sugri's actions as a legal advocate.

### B.     Quasi-Judicial Absolute Immunity for Enforcing Juvenile Court's Orders

Heithcock alleges that Sugri violated her rights while taking actions to effectuate the Juvenile's Court's order to remove M.H. into state custody.

"Quasi-judicial immunity extends to those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." *Cooper v. Parrish*, 203 F.3d 937, 950 (6th Cir. 2000); *Rippy ex rel. Rippy*, 270 F.3d at 422 (noting that "social workers . . . are entitled to absolute immunity while functioning in roles intimately associated with the judicial phase of proceedings"). More specifically, the Sixth Circuit has held that "an official is entitled to absolute quasi-judicial immunity when that official acts pursuant to a valid court order because the act of 'enforcing or

executing a court order is intrinsically associated with a judicial proceeding.'" *Bush v. Rausch*, 38 F.3d 842, 847 (6th Cir. 1994). This is because "officials must be permitted to rely upon a judge's findings and determinations to preserve the integrity of the court's authority and ability to function."[10] *Id.* A plaintiff therefore cannot sustain her claim unless she alleges "that the [official] engaged in conduct that exceeds the scope of the [judicial order]." *Cooper*, 203 F.3d at 948.

The Complaint alleges that M.H. was seized and removed from Heithcock's home without proper justification and based upon falsified allegations. In essence, Heithcock alleges that Sugri bears the blame for M.H.'s removal from Heithcock's home. The Complaint does not, however, allege anything untoward about the physical removal process itself, and the order to remove M.H. was issued by the Juvenile Court. Thus, as a procedural matter, to the extent that any entity was responsible for the removal of M.H. and any purported violation of Heithcock's rights, it was the Juvenile Court, not Sugri. *See Pittman*, 640 F.3d at 729; *Hope v. Mullins*, No. 14-1126, 2014 WL 7139715, at *7 (W.D. Tenn. Dec. 15, 2014).

Accordingly, Sugri enjoys absolute quasi-judicial immunity from Section 1983 claims related to Sugri's actions concerning M.H.'s removal from Heithcock's home that were undertaken at the direction of orders of the Juvenile Court. *Bush*, 38 F.3d at 847.

### C.  Qualified Immunity For Claims Based On Investigatory Actions

The doctrine of qualified immunity protects social workers "performing discretionary

---

[10] As the Sixth Circuit has observed, "[i]t does not seem logical to grant immunity to a judge in making a judicial determination and then hold the official enforcing or relying on that determination liable for failing to question the judge's findings. This would result in the official second-guessing the judge who is primarily responsible for interpreting and applying the law." *Bush*, 38 F.3d at 848.

functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Opening and proceeding with a social work child abuse investigation are discretionary functions that merit consideration for qualified immunity. *Achterhof v. Selvaggio*, 886 F.2d 826, 830 (6th Cir. 1989). Determining whether a government official is entitled to qualified immunity involves two inquiries: "first, we must determine whether the plaintiff has alleged facts which, when taken in the light most favorable to [her], show that the defendant-official's conduct violated a constitutionally protected right; [second,] we must . . . determine whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009)). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Bush*, 38 F.3d at 848. The court must thus examine whether Sugri's allegedly inadequate investigation violated a clearly established constitutional right.

Parents have a fundamental, clearly established right to the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). However, the Sixth Circuit has expressly held that investigation by authorities into child abuse allegations does not infringe upon a parent's right to familial association in the same manner as deprivation of custody and control

of a child. As the court plainly stated in *Kottymer v. Maas*, "none of the relevant cases suggest that mere investigation by the government of potential harm to a child infringes upon the [right to] familial association."[11] 436 F.3d 684, 691 (6th Cir. 2006) (citing *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir. 1993) ("The right to family integrity clearly does not include a constitutional right to be free from child abuse investigations."); *see also Stanley v. Illinois*, 405 U.S. 645, 649 (1972) (stating that the state has a "right – indeed, duty – to protect minor children through a judicial determination of their interests in a neglect proceeding"). Given that Sugri's investigatory conduct did not, therefore, violate a constitutionally protected right, Sugri is entitled to qualified immunity on claims arising from her investigation related to M.H. and Heithcock.

Nor does Sugri's investigation implicate the clearly established right to be free from unreasonable search and seizure. As discussed *supra*, the Complaint merely alleges that the investigation was inadequate, not that it directly caused the seizure of M.H.; it was the Juvenile Court that ordered M.H. removed from Heithcock's custody. Thus, to the extent that Heithcock or M.H. suffered a deprivation of any right regarding the taking of M.H. into state custody, that deprivation was perpetrated by the Juvenile Court, not by Sugri. Stated differently, because the Juvenile Court had the ultimate decision-making authority with respect to placement and custody

---

[11] This is because the right to familial association is limited by an equally compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents. *Kottmyer*, 436 F.3d at 690 (citing *Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir. 1987)). Governmental entities have a "traditional and transcendent interest" in protecting children within their jurisdiction from abuse. *Maryland v. Craig*, 497 U.S. 836, 855 (1990); *see also New York v. Ferber*, 458 U.S. 747, 757 (1982) (stating that "the prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance"). Thus, although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is necessary as against the parents themselves.

of M.H., it alone could "seize" M.H.; Sugri does not lose qualified immunity related to her investigation because the Juvenile Court may have so acted. *See Pittman*, 640 F.3d at 729.

Accordingly, Sugri is entitled to qualified immunity for claims based on the opening and conduct of the child abuse investigation into M.H. and Heithcock.

Given that, after application of absolute and qualified immunity, there is no remaining substantive basis for Heithcock's Section 1983 claims against Sugri, they will be dismissed in their entirety.

## III.    Individual Capacity Claims Against Supervisors Henry and Jones

It is well settled that a Section 1983 claim against a supervisor cannot be based on a *respondeat superior* theory of liability. *Petty v. Franklin Cnty.*, 478 F.3d 341, 349 (6th Cir. 2007); *Hays v. Jefferson Cnty.*, 668 F.2d 869 (6th Cir. 1982). The Sixth Circuit has consistently held that "damage claims against governmental officials alleged to arise from violations of constitutional rights cannot be founded upon conclusory, vague or general allegations, but must instead, allege facts that show the existence of the asserted constitutional rights violation recited in the complaint and what *each defendant* did to violate the asserted right." *Terrance v. Northville Reg'l Psych. Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002) (emphasis added). This includes claims against supervisors; indeed, "a supervisory official's failure to supervise, control or train [an] offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (internal quotation marks omitted). Stated differently, allegations of "personal involvement" are required to pursue a claim against a supervisor. *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005). "At a minimum, a [Section] 1983

plaintiff must [allege] that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008).

The Complaint falls short of alleging against Henry or Jones the "personal involvement" in violating Heithcock's civil rights that is required by the Sixth Circuit. As to Henry, the Commissioner of DCS, the Complaint fails to allege that he (1) even knew Heithcock's identity, (2) interacted with Jones regarding Sugri's work concerning M.H. and Heithcock, (3) interacted with Sugri regarding her work concerning M.H. and Heithcock, or (4) was aware of the M.H./Heithcock investigation's existence. In short, the Complaint is devoid of any factual allegation setting forth any personal involvement by Henry in any manner in the underlying alleged events concerning Heithcock. (*See generally* Docket No. 6.) Thus, the claim against Henry as a supervisor in his individual capacity is properly dismissed. *See, e.g., Top Flight Entm't, Ltd. v. Schuette*, 729 F.3d 623, 635 (6th Cir. 2013) (dismissing supervisor liability claim against attorney general where the plaintiffs had not alleged that he "implicitly authorized, approved or knowingly acquiesced" in his subordinate assistant attorney general's conduct "or that [he] was otherwise personally involved in the events leading to [the p]laintiffs' claims").

As to Jones, the Complaint makes two allegations. First, the Complaint alleges that Heithcock once "reported" to Jones what she believed to be Sugri's misrepresentations. (Docket No. 6 at ¶ 30). The Complaint provides no further details about Heithcock's alleged conversation with Jones, nor does it allege that Jones took any action in response to Heithcock's complaint. (*Id*.) Giving this allegation its most generous reading, it only establishes Jones' awareness of the Heithcock investigation and Heithcock's dissatisfaction with Sugri, not that Jones approved of or

was personally involved in the specific actions that Heithcock alleges violated her rights. Under Sixth Circuit precedent, awareness of Heithcock's complaints but failure to intervene does not constitute "personal involvement" in violation of Heithcock's rights for purposes of a supervisor liability claim under Section 1983. *See Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) (noting supervisory liability under Section 1983 cannot be based upon a mere failure to act; it must be based upon active unconstitutional behavior); *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998) (same). Accordingly, this allegation is insufficient to form the basis for a supervisor liability claim against Jones. *See, e.g., Grinter*, 532 F.3d at 576 (dismissing supervisor liability claims against two senior internal affairs officers when they failed to intervene despite being aware of prisoner's complaints against junior officer); *Shehee*, 199 F.3d at 300 (dismissing supervisor liability claims premised upon failure to remedy alleged retaliatory behavior by subordinates that was brought to supervisors' attention); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (dismissing supervisor liability claim where "[t]he testimony presented . . . at best, indicate[d] that some instances of alleged harassment were brought to the attention of prison supervisory officials.")

The Complaint also alleges that, during the relevant time, "Jones worked with Sugri." Even under the liberal pleading standard of Federal Rule of Civil Procedure 8(b)(2), this is fatally vague. Heithcock is required to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555. It is impossible to determine from this allegation to what degree – if any – Jones is alleged to have been personally involved in the M.H./Heithcock investigation, as opposed to simply functioning as the individual who supervised Sugri as a

matter of course in her role at DCS. Accordingly, dismissal of the supervisor liability claim against Jones is appropriate.[12]

## IV.    State Law Claims

A federal district court may, in its discretion, decline to exercise supplemental jurisdiction over a state law claim or claims, even if jurisdiction would otherwise be proper under § 1367(a). The court finds that, given the underlying domestic subject matter of this action and that the allegations focus exclusively on events that occurred in Tennessee, the Tennessee courts are best suited to hear Heithcock's pendant state law claims. The court will, therefore, decline to exercise supplemental jurisdiction over Heithcock's remaining claims.

## CONCLUSION

The Motion to Dismiss Official Capacity Claims (Docket No. 11) will be granted. The Motion to Dismiss Individual Capacity Claims (Docket No. 27) will be granted. The court will

---

[12] Under the "Third Cause of Action" section of the Complaint, Heithcock also generally alleges that Henry and Jones (1) were "aware" of a general custom of presenting false or misleading evidence to the courts; (2) have not changed a general policy of removing children from homes without evidence of exigent circumstances; (3) had a duty to follow policies that ensure the provision of rights and the protections of laws; (4) had the responsibility to properly supervise their employees and to refrain from acting with indifference; (5) turned a "blind eye" to their duties to supervise the power to seize children from their parents' care; (6) permitted the detention of children for unreasonably long periods of time; (7) permitted the use of "trickery, duress, fabrication and/or false testimony and failure to disclosure exculpatory evidence;" (8) acted with deliberate indifference to the rights of children and parents; (9) set forth allegations claiming abuse after inadequate investigations; (10) made false allegations and failed to pursue legitimate concerns of parents; (11) fraudulently charged parents with psychological harm and/or child abuse; and (12) failed to investigate violations of constitutional rights by social workers. (Docket No. 6 at ¶¶ 72-92.) These claims have no direct involvement with or specific connection to Heithcock. Accordingly, these additional factual averments do not provide any additional basis for a claim of personal involvement by Henry or Jones in the underlying events that form the basis for Heithcock's Section 1983 claims. These are the type of non-specific, conclusory allegations that the Sixth Circuit has rejected as inadequate to plead a supervisor liability claim.

decline to exercise supplemental jurisdiction over the remaining state law claims. This matter

will be dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge