IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| SAMARA HEITHCOCK, Individually and as next friend of her minor daughter, M. H., | ) ) ) ) | |
| Plaintiff, | ) ) | NO. 3:14-cv-02377 |
| v. | ) ) | JUDGE CAMPBELL MAGISTRATE JUDGE BROWN |
| TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES, et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM

### I. Introduction

Pending before the Court are Defendant Sugri's Motion For Summary Judgment (Doc. No. 59); Plaintiff's Answer To Motion For Summary Judgment (Doc. No. 62); and Defendant's Reply (Doc. No. 6). For the reasons set forth below, Defendant Sugri's Motion For Summary Judgment (Doc. No. 59) is **GRANTED,** and this action is **DISMISSED**.

### II. Factual and Procedural Background

A. Procedural Background

Plaintiff Samara Heithcock brought this action, individually and as next friend of her minor daughter, M.H., raising claims under 42 U.S.C. § 1983 and Tennessee law arising out of the temporary removal of M.H. from Plaintiff's custody. (Doc. Nos. 1, 6). Plaintiff named as Defendants the Tennessee Department of Children's Services ("DCS"), DCS Commissioner James M. Henry, DCS employee Sharonika Nelson Jones, DCS employee Jamila Sugri, and John Does 1 through 10. (*Id.*)

Through Memorandum and Order issued on August 14, 2015, Judge Aleta A. Trauger, to whom this case was originally assigned, granted Defendants' motion to dismiss the Plaintiff's federal claims for: (1) violation of Plaintiff's Fourteenth Amendment right to familial association; (2) violation of Plaintiff's Fourth Amendment protection against unreasonable seizure; and (3) supervisory liability based on these two claims. (Doc. Nos. 33, 34). More specifically, Judge Trauger determined that Eleventh Amendment sovereign immunity barred the claims against Defendant DCS, and the official capacity claims against Defendants Henry, Jones, and Sugri; absolute testimonial immunity barred the claims against Defendant Sugri for her testimony and recommendations to the juvenile court; quasi-judicial immunity barred the claims against Defendant Sugri for her child abuse investigation regarding M.H.; and Plaintiff failed to allege any personal involvement supporting the individual capacity claims against Defendants Henry or Jones. (*Id.*) Judge Trauger declined to exercise supplemental jurisdiction over Plaintiff's state law claims because the federal claims had been dismissed, and because she concluded that the subject matter of the action would be best suited for resolution by Tennessee courts. (*Id.*)

Plaintiff appealed the dismissal, and the Sixth Circuit affirmed the dismissal of all claims except Plaintiff's substantive due process claim for bad-faith child-services investigation against Defendant Sugri and any supplemental state law claims. (Doc. No. 46). On remand, Defendant Sugri filed the pending motion for summary judgment. (Doc. No. 59). The case was subsequently reassigned to the undersigned Judge. (Doc. No. 65).

B. Factual Background

Plaintiff Samara Heithcock is the mother of M.H., who was three years old at the time of the events relevant to this lawsuit. (Response To Statement Of Undisputed Facts In Support Of

2

Defendant Sugri's Motion For Summary Judgment, at ¶ 1 (Doc. No. 64) (hereinafter "Plaintiff's Response To Facts")). Plaintiff and M.H.'s father, Homer Disher (hereinafter "Father"), continued their relationship for a short time after the child was born, but by the events relevant to this lawsuit, they lived separately. (*Id.,* at ¶ 2). The parents shared custody of M.H. during the events relevant here, and the child spent alternating weekends with her father. (*Id.,* at ¶ 3).

Plaintiff admits that the parents had "some hostility" toward each other. (*Id.,* at ¶ 4). Plaintiff has alleged that Father was overly sexually aggressive toward her, and that he "solicited a hooker" two days before the birth of M.H. (*Id.*) Plaintiff has taken out a restraining order against Father. (*Id.*) Plaintiff has alleged Father is a demon worshipper, and has complained about Father's excessive drinking and sexual addiction. (*Id.*) At various times prior to this case, Plaintiff has asked the Williamson County Juvenile Court to restrict Father's visitation with M.H. (*Id.,* at ¶ 5).

According to Plaintiff, after the summer of 2013, M.H. began exhibiting behaviors that caused her concern, like touching her vaginal area and attempting to insert a hairbrush handle into her vaginal area, causing redness. (*Id.,* at ¶ 6). Plaintiff reported these behaviors to M.H.'s pediatrician in November 2013, who recommended an appointment at Our Kids, a private organization that provides expert medical evaluations and crisis counseling services in response to concerns of child sexual abuse. (*Id.,* at ¶ 7); (Doc. No. 60, at 2 n.1). Our Kids required Plaintiff to refer concerns of sexual abuse to DCS prior to making an appointment. (*Id.,* at ¶ 8). Plaintiff called the DCS child abuse hotline and reported the behaviors that her child's physician suggested might be sexual abuse. (*Id.,* at ¶ 9). Plaintiff did not allege that Father or anyone else had actually abused M.H. (*Id.*) Pursuant to DCS operating procedure, Plaintiff's hotline call was

3

assigned to Child Protective Services investigator Jamila Sugri for further investigation. (*Id.,* at ¶ 10).

Defendant Sugri immediately scheduled M.H. for a forensic interview with Davis House Child Advocacy Center, a private organization that provides comprehensive services, such as forensic interviews, case management, child and family advocacy, and counseling to alleged child abuse victims and their non-offending family members or caregivers. (*Id.,* at ¶ 11); (Doc. No. 60, at 3 n. 2). The interview occurred on November 22, 2013. (*Id.*)

Defendant Sugri did not participate in the November 22 forensic interview, but instructed one of her colleagues to attend and report the details of the interview. (*Id.,* at ¶ 12). The colleague reported her summary to Defendant Sugri on the same day. (*Id.*) Defendant Sugri also watched the video recording of the interview and reviewed the forensic investigator's report. (*Id.*) The forensic investigator's report classified the child's interview statements as being a "partial disclosure," meaning the child "acknowledged that something happened, but did not provide detail." (*Id.,* at ¶ 13).

According to Defendant Sugri, the report demonstrated inconsistencies in the child's statements during the initial forensic interview that gave her reasons to believe the child had not suffered any sexual abuse: (1) the child indicated that the abuse had taken place at Plaintiff's house but was perpetrated by the father, even though the father had not been present in Plaintiff's house since the child was approximately six months old; (2) the child's statements were internally inconsistent in that she told the forensic interviewer at various times that her clothes were both on and off, and that the abuse had occurred at her father and mother's house; (3) the child was evasive in answering questions and flatly ignored some of the interviewer's attempts to gain additional information; and (4) the only details related to the child's allegations that the

4

father had touched her concerned the application of medicine, which her grandmother and mother had also allegedly applied. (Doc. No. 60, at ¶¶ 14-17). Plaintiff neither admits nor denies that M.H made inconsistent statements, and contends that the alleged inconsistencies could be due to a lack of training by Defendant. (Plaintiff's Response To Facts, at ¶¶ 14-17).

After watching the video of the interview, Plaintiff alleges that the interviewer coached the child into making the disclosures. (*Id.,* at ¶ 18). Plaintiff admits that she does not know whether M.H. was touched, but contends that this conclusion is the result of insufficient and inadequate investigation. (*Id.*)

Because the initial forensic interview did not result in a clear disclosure, Defendant Sugri scheduled three separate follow-up interviews to gather more information. (*Id.,* at ¶ 19). Plaintiff and the child appeared for these interviews. (*Id.*) According to Defendant Sugri, the follow-up interviews did not result in sufficient information to substantiate any claims of sexual abuse by the child's father or anyone else. (Doc. No. 60, at ¶ 20). Plaintiff admits only that this is Defendant's interpretation of those interviews. (Plaintiff's Response To Facts, at ¶ 20).

Plaintiff and Father appeared in court on December 16, 2013, on Plaintiff's motion to restrict Father's visitation. (*Id.,* at ¶ 21). In evaluating whether to restrict Father's visitation, the juvenile court inquired of Defendant Sugri about the status of the investigation into the sexual abuse allegations. (*Id.*, at ¶ 22). The following is the entirety of Defendant Sugri's testimony:

| | |
|---|---|
| The Court: | What's your name, ma'am? |
| Ms. Sugri: | Jamila Sugri. |
| The Court: | And you are through who? |
| Ms. Sugri: | Department of Children's Services. |

5

> The Court: Okay. And is there some reason that I should be concerned about this child going to her dad's house?
>
> Ms. Sugri: Can I ask that the Court (inaudible) due to the nature of the allegations?
>
> The Court: Sure. So if you are not involved in this case, please remove yourself from the courtroom, including you.
>
> Ms. Sugri: (Inaudible), the department received a referral of allegations of sexual abuse against M., and that case is still under investigation. She was – M. was forensically interviewed at the Child Advocacy Center, and in her interview, she made a questionable disclosure, and so we asked that she receive an extended forensic of (sic) that center. So far she has been to two sessions. I believe she is scheduled for another one today.
>
> There has not been a clear disclosure. Disclosure – it's kind of questionable. The first forensic, she did – well, the allegations (inaudible), but when she was interviewed, she stated that (inaudible) told her that touch her in the private area, but she – the location did not make sense. It couldn't have happened there –
>
> The Court: I gotcha.
>
> Ms. Sugri: -- when she said it did. So we wanted a forensic – stated forensic and –
>
> The Court: How long does that take?
>
> Ms. Sugri: Probably about – she may see her one more time, which is today, and after that, she doesn't believe that she needs to see her again.
>
> The Court: And then how long before you guys do what you do after?
>
> Ms. Sugri: After that – well, if she – after seeing her today, we will probably just discuss it and it will be closed. So far, with the information we have, the allegation will be unfounded, unless something changes.
>
> The Court: Okay. That's enough. . . .

(Doc. No. 60-1, at 24-26; Plaintiff's Response To Facts, at ¶ 22).

Following the hearing, Defendant Sugri discussed the case with Father and his girlfriend.

(Plaintiff's Response To Facts, at ¶ 24). Father denied hurting the child and denied observing

6

any concerning behaviors. (Doc. No. 60 at ¶ 24). During the conversation, Father alleged that Plaintiff was mentally unstable and that the allegations against him were initiated merely to harass him. (Plaintiff's Response To Facts, at ¶ 25).

During a conversation with Defendant Sugri following the hearing, Plaintiff alleged that Father had hacked her emails. (*Id.*, at ¶ 27). Plaintiff did not raise any other new concerns or allegations against Father that could form the basis for further investigation. (*Id.*)

On January 27, 2014, Father served Plaintiff with an emergency petition for custody. (*Id.*, at 28). Plaintiff's attorney requested a brief hearing on that day to determine temporary placement pending a full hearing set for February 24, 2014. (*Id.*) At the hearing, the child's guardian *ad litem* called Defendant Sugri to testify. (*Id.*, at ¶ 29). Upon questioning from the juvenile court, Defendant Sugri testified that Father, not DCS, had filed the petition characterizing the situation as an emergency. (*Id.*, at ¶ 30). Defendant Sugri testified that she had concerns related to Plaintiff's potential actions, but that those concerns were not enough for her to file her own petition for emergency removal up until that point. (*Id.*, at 31). Defendant Sugri informed the juvenile court that her investigation into the concerns about the child's sexual behavior had resulted in the allegations being unsubstantiated. (*Id.*, at ¶ 32). That decision had been made by Defendant Sugri and the Child Protective Investigative Team on January 23, 2014. (*Id.*)

Defendant Sugri further testified at the January 27, 2014 hearing as follows:

Q. (Inaudible). What concerns do you have about Mother's mental instability?

A. I have been around Mother with the child present, and statements are not – I don't think they are statements that should be made around the child, and that happened, and she (inaudible) direction to discontinue in that line of conversation because of the child's presence.

7

I have collected some evidence from Mom, which the evidence was supposed to show the irrational behavior on Father's part, and there's been text messages and e-mails and in reading them I did not see what I was supposed to see. I saw instead – I had more concerns about her from that evidence.

\* \* \*

Q. What did you see?

A. I saw Mother constantly going at Father and threats of having the child removed from his custody.

Q. Did you see photographs (inaudible)?

A. There is a photograph of the child touching her – her private area.

\* \* \*

Q. Do you have concern for the child's safety if she remain[s] in Mother's care?

A. I don't know what Mother is capable of. I really don't. I can't say what my concern will be that she will do, but if we can go by the reports made by CASA [Court Appointed Special Advocates], stuff she's found out at Mom's (inaudible). I would want to make sure that she's okay, and in time to (inaudible) make sure that she's okay and she's going to be able to continue to take care of her.

\* \* \*

Q. Okay. And as far as the suicide attempts that you allege happen, who gave you that information?

A. CASA.

\* \* \*

Q. . . . What have you done to substantiate these claims that Mother has attempted suicide?

A. Nothing. I found out about it today.

(*Id.*, at ¶ 33).

Plaintiff admits she attempted to restrict Father's visitation rights with M.H. (*Id.*, at ¶ 35). Plaintiff admits that she took a photograph of M.H. engaging in inappropriate behavior and showed it to Defendant Sugri. (*Id.*, at ¶ 36). Plaintiff admits that M.H. entered the room during her discussion of the case with Defendant Sugri. (*Id.*, at ¶ 34).

After hearing evidence and argument, the juvenile court ordered the child into DCS's custody. (*Id.*, at ¶ 37). In its oral ruling, the court stated:

> There's a difference between not liking each other and ramping this up to an extent where the damage done to the child may be irreversible if something is not done immediately. I get it. I'm a divorce attorney. I see it all the time.
>
> * * *
>
> This is not typical parents not getting along, can't decide when the child is going to get a haircut, you know.
>
> * * *
>
> But both of you, this has escalated far beyond what this Court feels comfortable with with regard to this not even 3 – 3-year-old child, almost 4, that over the last two years, you guys have been back and forth to court, that the allegations made against both of you by each other have not only continued, but have escalated to the point of allegations of sexual abuse that have gotten the Child Protective Services involved, and I think the parties have requested psychological examinations.
>
> I am worried about this child and I don't think that there's anything that – any orders that I could put in place that would make me sleep well tonight, honestly.

(*Id.*)

In its order, the juvenile court acknowledged that DCS had not filed a petition for emergency removal or any petition related to the custody of the child. It, therefore, ordered Defendant Sugri and DCS to file a petition seeking removal of the child. (*Id.*, at ¶ 38). Following its oral ruling, the juvenile court entered a written order reflecting its opinion. (*Id.*, at ¶ 39).

9

The child was initially placed into the custody of Father's fiancée. (*Id.*, at ¶ 40). On February 12, 2014, during an emergency hearing, Father's fiancée claimed she could no longer adequately care for the child, and returned custody to DCS. (*Id.*) The child was then placed in foster care on an emergency basis. (*Id.*)

On February 14, 2014, in order to comply with the juvenile court's January 27, 2014 order, DCS filed a "Petition to Adjudicate Dependency/Neglect & For Temporary Legal Custody In Response to the Court's Removal Order." (*Id.*, at ¶ 41). Plaintiff admits that her Section 1983 claim does not relate to this Petition or any other action taken after January 27, 2014. (*Id.*)

On March 14, 2014, Plaintiff was granted a ninety-day trial home visit with the child. (*Id.*, at ¶ 42). On June 24, 2014, Plaintiff regained full legal physical custody of the child. (*Id.*) In total, the child spent approximately six weeks in foster care. (*Id.*)

III. Analysis

A. The Standards Governing Motions For Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has construed Rule 56 to "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.* Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, a court must draw all reasonable inferences in favor of the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Shreve v. Franklin*

*County, Ohio,* 743 F.3d 126, 132 (6th Cir. 2014). The court does not, however, make credibility determinations, weigh the evidence, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In order to defeat the motion, the nonmoving party must provide evidence, beyond the pleadings, upon which a reasonable jury could return a verdict in its favor. *Celotex Corp.*, 477 U.S. at 324; *Shreve,* 743 F.3d at 132. Ultimately, the court is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

B. <u>Substantive Due Process: Bad Faith Investigation</u>

On appeal, the Sixth Circuit explained the parameters governing Plaintiff's substantive due process claim against Defendant Sugri as follows:

> Although parents and children have a clearly established substantive due-process right to family integrity, that 'right is limited by an equal[ly] compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents.' *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006). Thus, 'the right to familial association is not implicated merely by governmental investigation into allegations of child abuse.' *Id.*
> 
> But we devised that principle with one qualification: 'This may be different,' we cautioned, 'if there is evidence that the investigation was undertaken in bad faith or with a malicious motive or if tactics used to investigate would "shock the conscience."' *Id.* At 692, n.1; *accord Kolley v. Adult Protective Servs.,* 725 F.3d 581, 585 (6th Cir. 2013). And indeed, Heithcock alleged that Sugri's investigation was done in bad faith and with improper investigatory tactics.
> 
> Yet, because the right to familial association 'focus[es] on the parental right of custody and control over their children,' *Kottmyer*, 436 F.3d at 691, the notion that bad-faith child-services investigations can violate that constitutional right seems at odds with another principle, that, '[b]ecause the juvenile court has the ultimate decisionmaking power with respect to placement and custody, it alone could deprive [a parent] of his fundamental right.' *Pittman*, 640 F.3d at 729. Thus, while it is generally true that only the court that ordered a child removed from custody can deprive a parent of the right to familial association, there is an

11

exception for when the court order is based on a bad-faith child-services investigation.

In sum, Heithcock stated a claim that Sugri's bad-faith investigation violated her constitutional right to familial association, and the district court's judgment dismissing this claim on qualified immunity grounds was in error.

(Doc. No. 46, at 7-8).

In order to establish her claim at trial, therefore, Plaintiff must show that Defendant Sugri engaged in a bad-faith child-services investigation, and that the juvenile court's order removing M.H. from her custody was based on that investigation.

In that regard, Plaintiff contends that absent Defendant Sugri's "invented facts of [her] mental instability and aggressiveness toward M.S.'s father, which she made appear as though she were simply adopting facts from CASA, the court would never have removed M.H." (Doc. No. 62, at 2). The fabrication of evidence during a child abuse and neglect investigation can support a claim of bad-faith investigation. *See Abdulsalaam v. Franklin County Bd. of Com'rs,* 637 F.Supp.2d 561, 583 (S.D. Ohio 2009). To support her allegation that Defendant Sugri fabricated evidence, Plaintiff has filed a CASA Report dated February 24, 2014, written by Ruth A. Gunning, in which Ms. Gunning states:

> [Father] is allegedly under criminal investigation in Williamson County for perjury, obstruction of justice and invasion of privacy. Some of these inaccurate statements and facts may have led to some of the previous court activity by [Mother] and a misinterpretation of the facts by CASA during the initial investigation.

(Doc. No. 63-4, at 2).

The Court is not persuaded that this report is evidence of fabrication by Defendant Sugri. First, the report was written *after* Defendant Sugri's testimony at the January 27, 2014 hearing that resulted in removal of the child. In addition, the report suggests that *CASA*, not the

12

Defendant, may have misinterpreted facts about Plaintiff during its initial investigation. That Defendant Sugri recounted CASA's initial conclusions during her January 24, 2014 testimony does not suggest that she fabricated evidence. On the contrary, Defendant Sugri made clear during her testimony that she had not conducted an independent investigation to confirm the initial conclusions reached by CASA. To the extent that Plaintiff suggests the initial CASA reports do not accord with Defendant Sugri's testimony at the hearing, Plaintiff has failed identify any such discrepancy.

Plaintiff also argues that Defendant Sugri should have interviewed her mother and her son as part of her investigation. In that regard, Plaintiff has filed Defendant Sugri's report of a conversation with Plaintiff's son, and a report of a conversation with Plaintiff and her mother, but argues that these conversations did not occur as reported. (Doc. Nos. 63-5, 63-6). Plaintiff contends that the conversation with her son lasted "about five (5) minutes," and appears to deny that her mother actually spoke as suggested in the report. (Doc. No. 63, at 4, 5). According to Plaintiff, these witnesses would have told Defendant Sugri that she was "mentally stable, am a good parent to M.H., and was genuinely concerned about M.H." (*Id.*, at 4).

Even if the conversations were not as extensive as reported, however, Plaintiff has not shown that the reports were intentionally fabricated. Nor has Plaintiff shown that interviewing these individuals would have furthered the investigation of possible sexual abuse of M.H., given that neither Plaintiff's son nor her mother are alleged to have information relevant to the allegation. Most importantly, Plaintiff has not shown that the opinions of her son and mother would have had any bearing on the juvenile court's decision to remove the child even if those opinions had been conveyed to the court during the January 27, 2014 hearing.

Plaintiff's other arguments relate to her disagreement with certain statements attributed to her in a report written by Defendant Sugri. (Doc. No. 63-3). For example, according to Plaintiff,

> I never stated I was convinced that something happened to M.H. and that [Father and his girlfriend] were engaging in sexual activity in front of M. H. Rather, I asked Sugri if she believed this was possible. I never threatened to take legal action against anyone. I told her I was going to try to get a subpoena to prove [Father] had hacked my email, since this was true and I felt I needed evidence to show I was not mentally unstable. I never asked Sugri whether a felony conviction would keep [Father] away from M.H. forever and I never apologized for 'wasting her time' since as previously stated, I did not want her in my home.

(Doc. No. 63, at 3-4).

Although Plaintiff believes the report is inaccurate, however, she has not shown that the report was intentionally fabricated. Indeed, Plaintiff's objections are primarily aimed at Defendant Sugri's interpretations of Plaintiff's statements. Regardless, Plaintiff has not shown that Defendant Sugri repeated these statements during her testimony at the January 27, 2014 hearing.

Therefore, the Court concludes that Plaintiff has failed to demonstrate the existence of a material factual dispute that Defendant Sugri engaged in a bad-faith child-services investigation. Plaintiff has not adduced evidence that the investigation was undertaken in bad faith, or with a malicious motive, or involved tactics that "shock the conscience."

Even if Plaintiff were able to demonstrate that Defendant Sugri's investigation was conducted in bad faith, however, she has failed to make the required showing as to the second element of her claim by demonstrating that the juvenile court's decision to remove M.H. was based on that investigation. Indeed, the explanation given by the juvenile court does not focus on Defendant Sugri's investigation, but rather relies primarily on the history of animosity between Plaintiff and the child's father:

> But both of you, this has escalated far beyond what this Court feels comfortable with with regard to this not even 3 – 3-year-old child, almost 4, that over the last two years, you guys have been back and forth to court, that the allegations made against both of you by each other have not only continued, but have escalated to the point of allegations of sexual abuse that have gotten the Child Protective Services involved, and I think the parties have requested psychological examinations.
>
> I am worried about this child and I don't think that there's anything that – any orders that I could put in place that would make me sleep well tonight, honestly.
>
> So I'm asking – ordering DCS to file a petition for emergency removal . . . I am not making a recommendation with regard to placement because I've got concerns about both parents.

(Doc. No. 64 at ¶ 37; Doc. No. 60-4, at 14-15).

For these reasons, the Court concludes that Plaintiff has failed to make a showing sufficient to establish the elements of her substantive due process claim based on a bad-faith child-services investigation. Accordingly, Defendant Sugri is entitled to summary judgment on that claim.

C. Supplemental Jurisdiction

Plaintiff has also raised various state law claims in her Amended Complaint. A federal court may decline to exercise supplemental jurisdiction over state law claims if all federal claims have been dismissed. 28 U.S.C. § 1367(c)(3). Given that Plaintiff's federal claims have been dismissed, and her state law claims involve family law issues that are best suited to be heard by Tennessee state courts, as explained in Judge Trauger's earlier ruling (Doc. No. 33, at 24), the Court declines to exercise supplemental jurisdiction over the state law claims.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE